**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**PECOS DIVISION**

| | | |
|---|---|---|
| **OSVALDO CAMBA PONCE,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **No. PE:22-CV-00012-DC-DF** |
| | § | |
| **UNITED STATES OF AMERICA and** | § | |
| **DEREK B. VOLMERING, Individually,** | § | |
| *Defendants.* | § | |

### REPORT AND RECOMMENDATION OF THE U.S. MAGISTRATE JUDGE

TO THE HONORABLE DAVID COUNTS, U.S. DISTRICT JUDGE:

BEFORE THE COURT is Defendant Derek B. Volmering's ("Volmering") Motion to Dismiss.[1] This case is before the undersigned United States Magistrate Judge through a standing order of referral pursuant to 28 U.S.C. § 636, and Appendix C of the Local Court Rules for the Assignment of Duties to United States Magistrate Judges. After due consideration, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED IN PART**.[2]

### I. BACKGROUND

On or about April 30, 2021, Plaintiff Osvaldo Camba Ponce ("Plaintiff") crossed into the United States from Mexico near Van Horn, Texas. Volmering, an agent with the United States Border Patrol ("Border Patrol"), was encountered and apprehended Plaintiff through the use of a canine unit reportedly named "Cappy," "Cappi," or a similar iteration.[3]

Plaintiff alleges the canine-assisted apprehension caused him various physical injuries. On August 31, 2022, Plaintiff filed his First Amended Complaint, which is the live pleading before the Court. He asserts claims against both the United States of America ("United States") and Volmering. Specifically, he argues that Volmering used unlawful force in apprehending him in violation of his

---

1. (Doc. 42).
2. (Doc. 42).
3. (Doc. 23 at 5).

Fourth Amendment rights under *Bivens v. Six Unnkown Named Agents of Federal Bureau of Narcotics*.[4] Plaintiff also presents against Volmering a state law claim for battery.

Volmering filed the Motion to Dismiss on November 10, 2022. Plaintiff has not responded. The United States filed a Notice of Substitution of the United States of America (hereafter, "Notice of Substitution") pertaining to Plaintiff's state law battery claim on November 10, 2022.[5] Accordingly, this matter is now ripe for disposition.

## II. LEGAL STANDARD

When a defendant files a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the trial court must assess whether a complaint states a plausible claim for relief.[6] The court must accept "all well-pleaded facts in the complaint as true and viewed in the light most favorable to the plaintiff."[7] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[8]

On the other hand, if the complaint only offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," dismissal is appropriate.[9] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[10] The court should dismiss the complaint if it can only infer the mere possibility of misconduct, or if the plaintiff has only alleged he is entitled to relief rather than stating a claim that is "plausible on its face."[11]

## III. ANALYSIS

Plaintiff asserts two separate claims against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346. As to Volmering, Plaintiff presents a claim for a violation

---

4. 403 U.S. 388 (1971).
5. (Doc. 43).
6. *See Raj v. La. State Univ.*, 714 F.3d 322, 329–30 (5th Cir. 2012).
7. *See id.*
8. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
9. *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).
10. *Shaw v. Villanueva*, 918 F.3d 414, 415 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678).
11. *Iqbal*, 556 U.S. at 678–79 (quoting *Twombly*, 550 U.S. at 570).

of his Fourth Amendment right "to be free from unreasonable seizures by using excessive and unreasonable force," as well as a claim based on state law battery. The United States requests that it be substituted for Volmering as to the battery claim. The battery claim will be addressed first.

## A.      State Law Battery Claim

In Plaintiff's state law battery claim, he argues Volmering "intentionally caused harmful or offensive contact with [him]" by (1) "intentionally releasing an unmuzzled Border Patrol canine to chase and apprehend a helpless, unarmed person"; (2) "verbally commanding this specially trained law enforcement tool to attack and maul a helpless, unarmed person"; and (3) "allowing this specially trained law enforcement tool to continue attacking and mauling an apprehended or subdued person." These actions, Plaintiff maintains, caused him to suffer severe injuries. He claims Volmering is individually liable for this alleged battery.[12]

Volmering argues the state law battery claim against him should be dismissed pursuant to the Westfall Act. He insists the United States should be substituted for Volmering according to a since-filed Notice of Substitution.[13]

The Westfall Act, codified at 28 U.S.C. § 2679, provides in pertinent part that:

[W]hen a federal employee is named in a tort suit, the Attorney General may certify that the employee was 'acting within the scope of his office or employment at the time of the incident out of which the claim arose,' which will cause the federal employee to be dismissed and the United States substituted as the defendant.[14]

The Westfall Act thus "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties."[15] Following the United States' substitution, the resulting litigation is thereafter governed by the FTCA.[16] All that is needed is

---

12. (Doc. 23 at 11–12).
13. (Docs. 42 at 1 n.2; 43).
14. *Morris v. Thompson*, 852 F.3d 416, 422 (5th Cir. 2017) (quoting 28 U.S.C. § 2679(d)(1)).
15. *Osborn v. Haley*, 549 U.S. 225, 229 (2007).
16. *Id.* at 230 (citing 28 U.S.C. § 1346).

a scope-of-employment certification by a qualified individual. This certification is subject to judicial review.[17]

In this case, the United States seeks to certify that, at the time of the incidents giving rise to the alleged battery, Volmering "was acting within the course and scope of his employment as an employee with the United States Customs and Border Protection." This certification is signed by Mary Kruger, Chief for the Civil Division of the Office of the United States Attorney for the Western District of Texas.[18] Pursuant to regulation, "[t]he United States Attorney for the district where the civil action or proceeding is brought . . . is authorized to make the statutory [scope-of-employment] certification."[19] Ms. Kruger therefore is a proper individual to provide the Westfall Act certification.

Because Volmering was acting within the course and scope of his federal employment, and a proper individual has moved for certification of this fact, the Westfall Act is applicable.[20] Therefore, the substitution of the United States for Volmering is proper. Accordingly, the undersigned **RECOMMENDS** that the United States a be **SUBSTITUTED** for Volmering as to Plaintiff's state law battery claim, and that the state law battery claim be **DISMISSED** as against Volmering.

## B.    *Bivens* Claim

Plaintiff also asserts a *Bivens* claim against Volmering. Volmering argues that existing *Bivens* remedies do not permit the instant cause of action. In the alternative, Volmering contends the facts of this case do not warrant this Court's recognition of a new *Bivens* remedy.[21]

### 1.    Background of *Bivens*

In 1971, the Supreme Court of the United States encountered *Bivens*. There, the petitioner was arrested in his apartment for alleged narcotics violations by agents of the Federal Bureau of

---

17. *Williams v. United States*, 71 F.3d 502, 505 (5th Cir. 1995).
18. (Doc. 43-1 at 1).
19. 28 C.F.R. § 15.4(a).
20. *See Hernandez v. United States*, 802 F. Supp. 2d 834, 839–40 (W.D. Tex. 2011), *vacated on other grounds sub nom. Hernandez v. Mesa*, 137 S. Ct. 2003 (2017).
21. (Doc. 42 at 3–14).

Narcotics "acting under claim of federal authority." The respondents, the agents, had strip-searched him and manacled him in front of and threatened to arrest his family. The petitioner sued the respondents based upon a lack of probable cause or a valid warrant, and asserted that "unreasonable force was employed in making the arrest." The petitioner sought $15,000 worth of damages from each agent.[22]

The lower courts dismissed the petitioner's complaint "on the ground . . . that it failed to state a cause of action." On appeal to the Supreme Court, the respondents argued that the petitioner "may obtain money damages to redress [an] invasion of [the petitioner's Fourth Amendment] rights only by an action in tort, under state law, in the state courts."

The Court first observed that the Fourth Amendment "guarantees to citizens . . . the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority." Affirming prior precedent, the Court noted that "where federally protected rights have been invaded, it has been the rule from the beginning that courts will . . . adjust their remedies so as to grant the necessary relief."[23]

The Court concluded that "damages may be obtained for injuries [for] a violation of the Fourth Amendment by federal officials." The Court framed the analysis to inquire whether a plaintiff, "if he can demonstrate an injury [based on a] violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts." The Court determined that this unprecedented remedy was warranted since the case involved "no special factors counseling hesitation in the absence of affirmative action by Congress." Recognizing that the typical source of remedies is congressional action, the Court finally acknowledged there was "no explicit congressional declaration" that the appropriate remedy

---

22. *Bivens*, 403 U.S. at 389–90.
23. *Id.* at 390, 391, 392 (quotation marks omitted).

would be something other than damages.[24] Thus, for the first time, the Court had, of its own extra-congressional volition "under general principles of federal jurisdiction,"[25] authorized a damages action against federal officials for a violation of a plaintiff's constitutional rights.[26]

### 2. Modern *Bivens*

In the fifty years since its release, the Supreme Court has viewed *Bivens* as "the product of an '*ancien regime*' that freely implied rights of action."[27] The "*Bivens* [regime] is well-settled law in its own context, but expanding the *Bivens* remedy is now considered a 'disfavored' judicial activity."[28] This regime, as the United States Court of Appeals for the Fifth Circuit observes, "ended long ago."[29] Nevertheless, *Bivens* and its progeny remain good law.[30]

As it stands, *Bivens* claims are limited to the contexts of the Supreme Court's *Bivens* trilogy:

(1) manacling the plaintiff in front of his family in his home and strip-searching him in violation of the Fourth Amendment[31];

(2) discrimination on the basis of sex by a congressman against a staff person in violation of the Fifth Amendment[32]; and

(3) failure to provide medical attention to an asthmatic prisoner in federal custody in violation of the Eighth Amendment.[33]

The Fifth Circuit itself has considered this issue many times in recent years.[34]

Courts follow a two-step analysis to decide if a case presented under *Bivens* can proceed. First, "ask whether the case presents "a new *Bivens* context." Second, "if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress" to weigh the wisdom of allowing a damages action.[35]

---

24. *Id.* at 395, 396, 397.
25. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017).
26. *Egbert v. Boule*, 142 S. Ct. 1793, 1800 (2022).
27. *Oliva v. Nivar*, 973 F.3d 438, 442 (5th Cir. 2020) (quoting *Abbasi*, 137 S. Ct. at 1855).
28. *Abbasi*, 137 S. Ct. at 1848 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).
29. *Oliva*, 973 F.3d at 442.
30. *Abbasi*, 137 S. Ct. at 1856–57.
31. *Bivens*, 403 U.S. at 389–90.
32. *Davis v. Passman*, 442 U.S. 228 (1979).
33. *Carlson v. Green*, 446 U.S. 14 (1980).
34. *See, e.g.*, *Cantu v. Moody*, 933 F.3d 414 (5th Cir. 2019).
35. *Egbert*, 142 S. Ct. at 1803 (citations omitted).

### a.    New Context

To determine if a context is new, courts consider whether and the "asserted constitutional right at issue" and "the mechanism of injury" are "the same as those in a previous *Bivens* case."[36]

Plaintiff asserts a violation of the Fourth Amendment, the very right representing the backdrop of *Bivens*. The Fourth Amendment reads:

> The right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[37]

Thus, the rights asserted here and in *Bivens* are identical. Yet the mechanism of injury— whether the violation is asserted in the same way—is a separate inquiry. Although *Bivens* and the instant case each involve the Fourth Amendment, courts do not define *Bivens* causes of action so generally, at the level of "the Fourth Amendment" or even that of "unreasonable-searches-and-seizures."[38] Accordingly, considering the three meager *Bivens*-related remedies, "[v]irtually everything else is a 'new context.'"[39] The "proper test" is whether "the case is different in a meaningful way from previous *Bivens* cases."[40] Even a "modest" extension from any of the *Bivens* cases is a "new" extension.[41] The Supreme Court enumerated several factors to inform whether a lawsuit "differs in a meaningful way" from the three existing *Bivens*-remedy cases:

(1) The rank of the officers involved;
(2) The constitutional right at issue;
(3) The generality or specificity of the official action;
(4) The extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted;
(5) The statutory or other legal mandate under which the officer was operating;
(6) The risk of disruptive intrusion by the Judiciary into the functioning of other branches; [and]

---

36. *Cantu*, 933 F.3d at 422 (citing *Abbasi*, 137 S. Ct. at 1859).
37. U.S. Const. amend. IV.
38. *Cantu*, 933 F.3d at 422.
39. *Oliva*, 973 F.3d at 442.
40. *Abbasi*, 137 S. Ct. at 1859.
41. *Id.* at 1864.

(7) The presence of potential special factors that previous Bivens cases did not consider.[42]

Here, the undersigned agrees with Volmering that this case presents a new context. Plaintiff's claimed violation of his Fourth Amendment right to be free from excessive and unreasonable force is perhaps the only similarity between the instant case and *Bivens*. This case arose out of an alleged illegal border crossing and canine-assisted apprehension, not a private home narcotics charge. This case also involves a canine unit, not federal agents' own physical force. Further, instead of Bureau of Narcotics agents, Volmering is a Border Patrol agent. Volmering is not alleged to have manacled Plaintiff in front of his family, strip-searched him, or threatened to arrest bystanders, but instead effectuated dog bites via the canine unit. Contrariwise, the Bureau of Narcotics agents in *Bivens* did not use "specialized drones" or other technical equipment to locate the plaintiff. Nor did the *Bivens* agents apprehend suspected illegal immigrants near an international border instead of making a warrantless search for narcotics.

Across the contexts presented here and in *Bivens*, the judicial guidance varies.[43] Thus, Plaintiff's claim "involves different conduct by different officers from a different agency."[44] There are more distinguishing factors, but it should be obvious that this context is new.

### b.    Special Factors

Given the novelty of this case's context, the undersigned considers the existence of special factors counseling against recognizing a new *Bivens* remedy. From 1971 until mid-2022, the Supreme Court "declined 11 times to imply a [*Bivens*-like] cause of action for other alleged constitutional violations."[45] Indeed, "the Court has refused to do so" since the 1980s.[46]

---

42. *Id.* at 1859–60.
43. *See Cantu*, 950 F.3d at 423 (noting variations across "Fourth Amendment violations—like seizures by deadly force, searches by wiretap, *Terry* stops, executions of warrants, seizures without legal process ('false arrest'), seizures with wrongful legal process ('malicious prosecution'), etc.").
44. *Oliva*, 973 F.3d at 443 (quotation marks omitted).
45. *Egbert*, 142 S. Ct. at 1799.
46. *Abbasi*, 137 S. Ct. at 1857.

This is due in part to the predominant question at this stage: "who should decide whether to provide for a damages remedy, Congress or the courts?"[47] In most cases, the answer to this question "will be Congress."[48] The Supreme Court has noted that the "selection of that policy which is most advantageous to the whole involves a host of considerations that must be weighed and appraised. That function is more appropriately for those who write the laws, rather than for those who interpret them."[49] The central aspects of this analysis involve "separation-of-powers principles."[50]

As such, the Supreme Court has recognized two ways to defeat a *Bivens* action. The first is where defendants illustrate that "Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective."[51] The second is where defendants demonstrate "special factors counselling hesitation in the absence of affirmative action by Congress."[52]

### i.        Alternative Remedies

Volmering first argues that the Border Patrol's own policies and statutory directives provide an alternative remedy for Plaintiff's claim. The undersigned agrees.

"[I]f Congress has created any alternative, existing process for protecting the injured party's interest[,] that may itself amount to a convincing reason for the Judicial Branch to refrain from providing anew and freestanding remedy in damages."[53] In particular, the Fifth Circuit has emphasized that "the existence of a statutory scheme for torts committed by federal officers" weighs against inferring a new *Bivens* constitutional cause of action.[54] "And when alternative methods of relief are available, a *Bivens* remedy usually is not."[55]

---

47. *Id.* at 1857 (quotation marks omitted).
48. *Id.*
49. *Bush v. Lucas*, 462 U.S. 367, 380 (1983) (quotation marks omitted).
50. *Abbasi*, 582 U.S. at 1857.
51. *Carlson*, 446 U.S. at 18–19 (emphasis in original).
52. *Id.*
53. *Abbasi*, 137 S. Ct. at 1858 (alterations and quotation marks omitted).
54. *Oliva*, 973 F.3d at 443–44.
55. *Abbasi*, 137 S. Ct. at 1863.

In this case, there exist alternative remedies for Plaintiff's claim. The Border Patrol, which is a subset of the Department of Homeland Security ("DHS"), is statutorily obligated to "control, direct[], and supervis[e] . . . all employees."[56] DHS regulations require that the agency investigate "[a]lleged violations of the standards for enforcement activities," as well as "accept grievances from '[a]ny persons wishing to lodge a complaint'" pertaining to "violations of enforcement standards."[57] The Supreme Court has observed that the resulting DHS and Border Patrol directives stand as a presumably adequate remedial measure for constitutional violations involving Border Patrol agents.[58]

Congress itself created, devised, and permitted the extant scheme. This fact alone should be sufficient reason to hesitate to extend *Bivens* into this context. Plaintiff has not addressed these regulations and statutes in a response the Motion to Dismiss; he likewise has not asserted he utilized this remedy.[59] On this ground alone, the undersigned believes adequate remedies counsel against the creation of a superfluous *Bivens* remedy here.

Volmering additionally asserts that the FTCA is yet another remedial structure which independently forecloses Plaintiff's request for a *Bivens* claim here. The FTCA, codified at 28 U.S.C. §§ 2671, *et seq.*, provides in pertinent part:

> Any claim arising out of . . . battery . . . : *Provided,* That, with regard to acts or omissions of investigative or law enforcement officers of the United States . . . , the provisions of this chapter and [S]ection 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of . . . battery . . . . For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.[60]

---

56. *Egbert*, 142 S. Ct. at 1806 (citing 8 U.S.C. § 1103(a)(2)).
57. *Id.* (quoting 8 C.F.R. § 287.10(a)–(b)).
58. *See Egbert*, 142 S. Ct. at 1806–07 ("[T]he question whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts."). The purpose of *Bivens* is to "deter[] the unconstitutional acts of individual officers." *Id.* at 1806. The Border Patrol-DHS procedure so comports. *Id.* at 1807 ("[W]e have no warrant to doubt that the consideration of [the plaintiff's] grievance against [the defendant Border Patrol agent] secured adequate deterrence and afforded [the plaintiff] an alternative remedy.").
59. The only remedy Plaintiff conceivably claims he took advantage of is the filing of Standard Form 95. (Doc. 23 at 3). This form is used to present claims under the Federal Tort Claims Act ("FTCA") and is inapplicable here. *See Tamez v. United States*, No. 2:18-CV-83, 2018 WL 4921731, at *10 n.8 (S.D. Tex. Oct. 10, 2018).
60. 28 U.S.C. § 2680(h).

This category of law enforcement officers includes Border Patrol agents such as Volmering. In order to avail oneself of the FTCA, a plaintiff must first proceed through the Border Patrol's administrative process.[61] Plaintiff claims he followed this process by filing an administrative tort complaint with the Border Patrol. The complaint was denied on October 8, 2021.[62] He then brought the instant suit against the United States under the FTCA as well as Volmering under *Bivens*.

In this instance, the FTCA also provides a sufficient remedy. Plaintiff has brought suit against the United States for his injuries pursuant to the FTCA. Therefore, Plaintiff's own conduct, as Volerming argues, demonstrates that there is an alternative remedial scheme for the relevant injuries.[63]

Further, as discussed above, the Westfall Act applies to the state law battery claim against Volmering. The Westfall Act makes the FTCA the "exclusive remedy for most claims against Government employees arising out of their official conduct."[64] Because the undersigned recommends that the United States be substituted as defendant for Volmering for the state law battery claim, and that Volmering be dismissed from that claim pursuant to the Westfall Act, the FTCA will become the exclusive remedy for battery and the incidents giving rise to the purported *Bivens* action here.

Perhaps the FTCA will not provide the exact same remedy as a potential *Bivens* remedy. However, the Supreme Court has clarified that congressionally provided relief is adequate even if it is demonstrated that said procedures are "not as effective as an individual damages remedy" under *Bivens*.[65] That Plaintiff may envision an idealistic individual monetary damages remedy is of no consequence, for when an alternative method of relief is available, "a *Bivens* remedy usually is not."[66] The undersigned detects no reason to manufacture one here.

---

61. *See* 28 U.S.C. § 2675 (requiring administrative exhaustion of a claim).
62. (Doc. 23 at 3).
63. *See Oliva*, 973 F.3d at 444.
64. *Hui v. Castaneda*, 559 U.S. 799, 806–07 (2010) (citing 28 U.S.C. § 2679(b)(1)).
65. *Egbert*, 142 S. Ct. at 1807 (quotation marks omitted).
66. *Abbasi*, 137 S. Ct. at 1863.

Two alternative remedial structures exist for individuals in Plaintiff's position, one of which Plaintiff has already taken advantage of. Congress formulated this exclusive-remedy scheme, apparently foreclosing *Bivens* or any other remedy for torts committed by federal agents. "[T]h[is] alone" should be "reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action."[67] Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED** as to Plaintiff's *Bivens* claim against Volmering.

### ii.   Other Special Factors

In addition to the alternative remedies available via the DHS processes and the FTCA, the undersigned recognizes that other special factors counsel against authorizing a *Bivens* remedy here. In determining whether other special factors exist, courts look at "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."[68] The defining feature of a "special factor" is that it "must cause a court to hesitate before answering that question in the affirmative."[69] "If any special factors do exist, then courts *must refrain* from creating an implied cause of action."[70]

In this case, there are several additional factors counselling against extending *Bivens* to this case. The Border Patrol has a mandate to "interdict[] persons attempting to illegally enter or exit the United States."[71] Border Patrol agents "stationed right at the border . . . [generally] have the responsibility of attempting to prevent illegal entry."[72] Volmering and Cappy allegedly apprehended Plaintiff near the Mexican border. Plaintiff admits he had just crossed over the border, presumably, and as Volmering suspected, illegally. Thus, a Border Patrol agent apprehending Plaintiff was of the type envisioned and mandated by statute.

---

67. *Egbert*, 137 S. Ct. at 1804 (quotation marks omitted).
68. *Abbasi*, 137 S. Ct. at 1857–58.
69. *Id.* at 1858.
70. *Canada v. U.S. IRS*, 950 F.3d 299, 309 (5th Cir. 2020) (emphasis in original) (quotation marks omitted).
71. 6 U.S.C. § 211(e)(3).
72. *Hernandez*, 140 S. Ct. at 746.

Even if it assumed Plaintiff did not cross illegally, Border Patrol agents patrolling an international border is "intimately related to . . . national security." Such matters are "rarely proper subjects for judicial intervention."[73] The Supreme Court has recognized that Congress is indubitably "better positioned to create remedies in the border-security context."[74] Indeed, "the conduct of agents positioned at the border has a clear and strong connection to national security."[75] The Judiciary is ill-equipped to impose policy decisions upon national security questions, as they are "delicate, complex, and involve large elements of prophecy."[76]

Plaintiff's lack of response to the Motion to Dismiss gives no credence to any notion that this case presents a reason to perform an end-run around this monumental obstacle to creating a *Bivens* remedy. Thus, if a decision is to be made to prevent the deployment of canine units by Border Patrol agents in Texas, or to provide for an individual damages remedy in the event such unit uses excessive force, as alluded to above, it is one for Congress exclusively to make. To judicially legislate otherwise presents a substantial risk of undermining border security.[77]

Moreover, any extension of *Bivens* "entails substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."[78] Imposing *Bivens* liability in this scenario, one involving important national security concerns, Border Patrol agents might refrain from taking necessary urgent and lawful action to fulfill their duties and responsibilities at the border.[79] If there is a reason to believe the benefits of a *Bivens* remedy here, where a canine unit bites a suspected illegal immigrant for five

---

73. *Egbert*, 142 S. Ct. at 1804–05 (quotation marks omitted).
74. *Id.* at 1804.
75. *Hernandez*, 140 S. Ct. at 746.
76. *Id.* at 749 (citing *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1414 (2018) (Gorsuch, J., concurring in part and concurring in judgment)) (quotation marks omitted).
77. *See id.* at 747.
78. *Egbert*, 142 S. Ct. at 1807.
79. *See Abbasi*, 137 S. Ct. at 1863.

minutes,[80] outweigh the risks posed by inducing hesitation upon Border Patrol agents, Plaintiff has not pleaded one.

In conclusion, the undersigned finds no reason to circumvent the Supreme Court's own understanding that "the Judiciary is comparatively ill suited to decide whether a damages remedy against any Border Patrol agent is appropriate."[81] The Court at one point considered whether courts generally are competent to authorize *Bivens* actions against Border Patrol agents generally. "The answer," the Court said, "plainly, is no."[82] With Plaintiff having been silent in the face of the Motion to Dismiss, and given the national security concerns and social costs presented by the prospect of extending *Bivens* in this case, the undersigned must concur.

The *Bivens* shibboleth is performing its jurisprudential swan song. If there were a time to extend *Bivens* to five-minute-long Border Patrol canine unit maulings, it most certainly has passed. Further, this case presents a context distinct from recognized *Bivens* cases. Yet, national security concerns cause hesitation before handcuffing Congress in its ability to provide its own remedies. Therefore, a *Bivens* remedy cannot be authorized here. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED** as to Plaintiff's *Bivens* claim against Volmering.

## C.      Qualified Immunity

---

80. Perhaps one could surmise that five minutes of mauling is excessive, as the undersigned concludes below. But does this warrant a new *Bivens* remedy? If so, what would be the new regime? Suspected illegal immigrants can sue Border Patrol agents if their canine unit attacks them for too long a duration in violation of the Fourth Amendment? This is an untenable, highly specific, and judicially nonviable amalgamation of a cause of action. Plaintiff has not suggested a better rule.
81. *Egbert*, 142 S. Ct. at 1805 (exclaiming "the Judiciary is not undoubtedly better positioned than Congress to authorize a damages action in this national-security context" involving a Border Patrol agent).
82. *Id.* at 1806.

Volmering also asserts the defense of qualified immunity.[83] In the Fifth Circuit, "the *Bivens* question" is "antecedent" to the question of qualified immunity.[84] Thus, the issue of qualified immunity should only be reached if the Court concludes a new *Bivens* remedy is warranted here.

The doctrine of qualified immunity "shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[85] "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[86] The doctrine applies to "all but the plainly incompetent or those who knowingly violate the law."[87] "Qualified immunity represents the norm," so "courts should deny a defendant immunity only in rare circumstances."[88]

As a Border Patrol agent acting in the course and scope of his employment, the presumption of qualified immunity applies to Volmering. Plaintiff therefore must plead sufficient facts showing the inapplicability of that defense.

In determining whether qualified immunity applies at the motion to dismiss stage, courts generally follow a two-step process, inquiring (1) "whether the facts that a plaintiff has alleged or shown make out a constitutional violation"; and (2) "whether the violation was objectively unreasonable in light of law that was clearly established at the time of the alleged misconduct."[89] "To defeat qualified immunity, a plaintiff must demonstrate that it would be clear to a reasonable officer

---

83. (Doc. 42 at 14).
84. *Byrd v. Lamb*, 990 F.3d 879, 881 (5th Cir. 2021) (citing *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017)).
85. *Serrano v. U.S. Customs & Border Patrol*, 975 F.3d 488, 503 (5th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).
86. *Pearson*, 555 U.S. at 231.
87. *Abbasi*, 137 S. Ct. at 1867 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).
88. *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (internal quotation marks and citations omitted).
89. *Cabello v. Torres*, No. DR-11-CV-0078-AM-CW, 2014 WL 12986196, at *7 (W.D. Tex. Jan. 3, 2014); *Blakely v. Andrade*, 360 F. Supp. 3d 453, 479 (N.D. Tex. 2018).

that his conduct was unlawful in the situation he confronted."[90] The plaintiff ultimately has the burden to negate the assertion of qualified immunity.[91]

### 1.     Excessive and Unreasonable Force

Plaintiff alleges he crossed into the United States from Mexico in West Texas. He ran toward a highway when he "saw a Border Patrol-marked vehicle," and stopped running to catch his breath when he believed he saw the vehicle activate its lights. He was "leaned against a fence" when Volmering's "unmuzzled" canine unit charged at him. He avers that Volmering commanded the canine with the phrase "Squash." The canine unit allegedly "attacked and mauled Plaintiff" while the "Squash" commands were ongoing, biting his arm and "violently" pulling and jerking his body. The interaction "persisted for at least five minutes before [] Volmering finally called the . . . canine off." Plaintiff lastly alleges Volmering "stood by and allowed [Cappy] to continue mauling Plaintiff" despite his cries for help.[92]

Plaintiff's version of the facts illustrates a singular incident of canine-induced force, albeit one lasting at least five minutes. Plaintiff claims Volmering violated his Fourth Amendment right to be free from excessive and unreasonable force. To establish a claim for excessive and unreasonable force, a plaintiff must establish "(1) an injury"; "(2) which resulted directly and only from a use of force that was clearly excessive"; "and (3) the excessiveness of which was clearly unreasonable."[93] Volmering only disputes the second and third elements.

---

90. *Shumpert v. City of Tupelo*, 905 F.3d 310, 321 (5th Cir. 2018).
91. *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020).
92. (Doc. 23 at 4–5).
93. *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 287 (5th Cir. 2020).

As for the remainder of the second[94] and third excessive force elements, the Fifth Circuit recognizes that they "collapse into a single objective-reasonableness inquiry."[95] "[I]n the context of arrests," these claims are "judged under the Fourth Amendment's 'objective reasonableness' standard."[96] The reasonableness of an officer's actions is "judged from the perspective of a reasonable officer on the scene, and only the facts then knowable to the defendant officer[] may be considered."[97] Because "officers are often forced to make split-second judgments . . . in circumstances that are tense, uncertain, and rapidly evolving," courts are admonished to "not use 'the 20/20 vision of hindsight.'"[98] The analysis is guided by the principle that courts must "be cautious about second-guessing" an "officer's assessment of the threat level."[99]

In determining whether the force used was excessive, the objective reasonableness standard examines the *Graham* factors, which include: "the severity of the crime at issue, whether the suspect poses a threat to the safety of the [law enforcement] officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest."[100] Where an officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."[101] Although all factors

---

94. Volmering also insists that Plaintiff's live Complaint lacks sufficient allegations that his injuries "resulted directly and only from the use of force that was clearly excessive." (Doc. 42 at 18). However, the Motion to Dismiss makes scarce reference to the causation element. Indeed, it appears Volmering's argument concerning the second element is tied instead to whether his alleged conduct was clearly excessive. Plaintiff notes at several points that his injuries are the "direct and proximate result of th[e] attack." While he does not expressly state his "severe bodily injuries" requiring stitches were only the result of his interaction with the canine unit, it can be inferred from Plaintiff's pleadings that he did not have these injuries pre-interaction. Plaintiff's injuries, which allegedly were so severe that he required emergency medical treatment, took place after he allegedly ran to the extent of exhaustion where he had to "catch his breath." (Doc. 23 at 12, 13). It would obviously run counter to logic to believe that one can reach respiratory exhaustion while sustaining surgery-requiring injuries. Therefore, the inference that the canine unit—without any mention of Volmering—caused Plaintiff's alleged injuries can and should be drawn.
95. *Peña v. City of Rio Grande*, 879 F.3d 613, 619 (5th Cir. 2018).
96. *Escobar v. Monetee*, 895 F.3d 897, 393 (5th Cir. 2018); *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (quoting *Graham*, 490 U.S. at 388).
97. *Crane v. City of Arlington*, 50 F.4th 453, 463 (5th Cir. 2022)
98. *Escobar*, 895 F.3d at 393–94 (quoting *Graham*, 490 U.S. at 396–97).
99. *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) (quotation marks omitted).
100. *Crane*, 50 F.4th at 463 (citing *Graham*, 490 U.S. at 396).
101. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

are relevant, "the threat-of-harm factor typically predominates the analysis when deadly force has been deployed."[102]

Turning to the *Graham* analysis, the undersigned concludes that the first factor favors Plaintiff. Although the live Complaint is imprecise in outlining what crime Plaintiff was suspected of committing prior to Cappy's intervention, context clues provide some insight. Plaintiff asserts he crossed the border into the United States from Mexico on foot, in an area monitored by the Border Patrol.[103] Volmering, in his Motion to Dismiss, exclaims that Plaintiff was apprehended "after having illegally entered the country."[104] The only plausible inference is that Plaintiff's arrest emanates from suspected illegal immigration.

Illegal immigration by border-hopping, while perhaps dangerous to the individuals who engage in it, is not evidently a serious offense from which law enforcement may reasonably expect suspects to be violent or threatening.[105] To this end, it is not obvious and Volmering does not assert that crossing the border illegally is such a severe or dangerous an infraction as to warrant a five-minute mauling by a Border Patrol canine unit.[106] Therefore, this factor weighs in favor of Plaintiff.

Next, the undersigned believes the second *Graham* factor of also favors Plaintiff. He asserts he "was not carrying any weapons, controlled substances, or contraband," nor was he "visibly carry[ing] anything that could be perceived as a weapon, controlled substance, or contraband."[107] Volmering argues these are conclusory statements.

On a motion to dismiss, the Court should generally accept well-pleaded facts as true. Plaintiff's allegations, that he was not "visibly carry[ing] anything that could be perceived as a

---

102. *Crane*, 50 F.4th at 463 (quotation marks omitted).
103. (Doc. 23 at 4).
104. (Doc. 42 at 1).
105. *See, e.g.*, *Estate of Hernandez-Rojas v. United States*, 62 F. Supp. 3d 1169, 1182 (S.D. Cal. 2014) (distinguishing between "non-severe, non-violent" illegal border crossings and "felony" assault on law enforcement officers).
106. *Zelaya v. Hammer*, 516 F. Supp. 3d 778, 809–10 (E.D. Tenn. 2021).
107. (Doc. 23 at 4).

weapon" or other threatening item and was "clearly unarmed" relate to the third-party objective perspective comprising the elements of an excessive force claim.[108] These are not well-pleaded facts and merely recite the second *Graham* factor. Therefore, these allegations are conclusory.

However, Plaintiff's allegations that he "had no weapons" and "posed no threat to anyone" are not conclusory.[109] Neither are the allegations that Plaintiff was "unarmed" and not carrying any weapons.[110] Whether Plaintiff had weapons or posed a threat are not elements of an excessive force claim, but rather are Plaintiff's factual allegations about himself. Defendant does not argue that Plaintiff was armed, dangerous, or otherwise. These allegations accordingly are not conclusory and support the conclusion that Plaintiff, taking all factual allegations as true, was harmless and unarmed.

Volmering points out that Plaintiff admits he was traveling with other individuals and was "not easily visible."[111] Plaintiff alleges Volmering and other Border Patrol agents "used, or had the equipment and skills to use, specialized drones to track and observe [his] movements."[112] The most reasonable inference from this allegation is that Plaintiff was not as readily visible at the time of his arrest as he would have been in, perhaps, broad daylight, clear weather, and within line of sight of Border Patrol officers. At the same time, however, this allegation does not lead to the inference that the apprehension took place at nighttime or in poor visibility such as fog or a dust storm.[113] In this instance, it is not apparent that Plaintiff's trek along the highway was so obfuscated that Volmering would believe he posed a threat. Indeed, Plaintiff alleges he began running when he saw a vehicle with Border Patrol markings, and stopped once he saw its lights activate. This buttresses the inference that visibility was greater than zero, at least sufficient for Plaintiff to make out the insignia

---

108. *See, e.g.*, *Watkins v. Gautreaux*, 515 F. Supp. 3d 500, 516 (M.D. La. 2021) (finding relevant perspective to be plaintiff's appearance to a "reasonable officer on the scene")
109. *See, e.g.*, *Ramirez v. Escajeda*, 298 F. Supp. 3d 933, 949 (W.D. Tex. 2018).
110. *See Swenson v. Palecek*, No. 3:19-cv-821-BJD-PDB, 2021 WL 2917633, at *5 (M.D. Fla. July 12, 2021) (finding assertion that plaintiff was "unarmed and agreed to surrender" to not be conclusory).
111. (Doc. 42 at 17).
112. (Doc. 23 at 6).
113. *See Matthews v. Jones*, 35 F.3d 1046, 1051 (6th Cir. 1994).

on the vehicle. Further, there is no assertion Plaintiff disobeyed Border Patrol commands or was attempting to bait them by stopping at the fence.[114] Plaintiff claims he posed no threat, and Volmering does not contend otherwise. That the terrain of Van Horn is "rugged"[115] does not signify that a Border Patrol officer would reasonably believe any individual in such an area is dangerous or poses a threat.[116] Likewise, mere uncertainty about Plaintiff's physical location or appearance is insufficient to warrant the inference that a reasonable officer would believe Plaintiff posed any threat. Therefore, this factor slight favors Plaintiff.

The last *Graham* factor is whether Plaintiff was "actively resisting arrest or attempting to evade arrest." The live Complaint explains that Plaintiff saw a Border Patrol-marked vehicle, then ran towards a highway. After he saw the vehicle "activate its lights," he stopped running and "leaned against a fence to catch his breath." It is unclear whether Plaintiff stopped running because he allegedly saw the Border Patrol vehicle activate its lights, or instead because he became exhausted and tried to fully respirate, or both. If the former is true, it can be inferred that he did not believe he was under Border Patrol suspicion until the vehicle activated its lights. Regardless, Plaintiff's own perception of Volmering is not dispositive, as the proper perspective is that of a reasonable officer in Volmering's position, not the suspect's own mindset.[117]

If the latter or both are true, however, this factor weighs in Volmering's favor. Volmering correctly observes that Plaintiff admits he stopped running to catch his breath, with no indication that he had an intent to or did surrender.[118] From Volmering's perspective, it seems unlikely that a reasonable Border Patrol agent would know that Plaintiff, who stopped his foot maneuvers out of

---

114. *See Ramirez v. Martin*, No. 22-10011, 2022 WL 16548053, at *3 (5th Cir. Oct. 31, 2022) (unpublished).
115. (Doc. 42 at 17).
116. *See Pharr v. Wille*, No. 1:14-CV-762-DAE, 2016 WL 4082740, at *10 (W.D. Tex. July 29, 2016) (finding reasonable belief of immediate threat to safety where neighborhood of arrest "was known for high-crime and violence").
117. *See United States v. Somerville*, No. 20-CR-153-PAM-KMM, 2021 WL 3476596, at *9 (D. Min. May 13, 2021).
118. (Doc. 42 at 18).

exhaustion, would not again attempt to evade arrest once he recovered. Plaintiff does not allege he was cornered, shackled, or in any other way left with "no meaningful way to evade [Border Patrol] custody."[119] Nor does Plaintiff mention the presence of additional Border Patrol agents which may illustrate that even had Plaintiff attempted to run away, he would have been immediately apprehended.[120] In fact, Plaintiff alleges that "more Border Patrol agents" arrived at the scene only following Cappy's release. While the canine unit's latching conceivably limited Plaintiff's voluntary movement while "violently pulled and jerked Plaintiff['s] entire body," Plaintiff does not assert he did not intend to continue his perceived evasion.[121]

Therefore, it is unclear whether Plaintiff would not have attempted to evade arrest without the use of the canine unit. Perhaps most striking is the length of the attack, which Plaintiff claims lasted "at least five minutes."[122] Courts have found the use of canine units to be reasonable when a suspect has been or is suspected to continue fleeing.[123] The Fifth Circuit itself, however, cautions against excessive durations of dog attacks.[124] Additionally, under the "measured and ascending" approach, the continued use of force is found to be not excessive only when a suspect is resisting arrest, and "provided the officer ceases the use of force once the suspect is subdued."[125]

With this in mind, Volmering's being the only agent on the scene during the attack may have warranted the continued use of the canine to restrain Plaintiff. Though Plaintiff's pleadings could provide more factual details, Volmering allegedly released the dog shortly before other Border Patrol agents arrived. The nearly contemporaneous arrival of additional agents and release of the dog

---

119. *Joseph v. Bartlett*, 981 F.3d 319, 340 (5th Cir. 2020).
120. *See id.* (finding the factor in favor of plaintiff where he "was cornered behind the counter and would have had to get past as many as a dozen police officers in order to leave the store").
121. (Doc. 23 at 4).
122. (*Id.* at 5).
123. *See, e.g.*, *White v. Calvert*, No. H-20-4029, 2021 WL 6112791, at *10 (S.D. Tex. Dec. 27, 2021); *Ramsey v. Bossier City*, No. 20-1608, -- F. Supp. 3d -- , 2022 WL 16700676, at *3 (W.D. La. Nov. 3, 2022).
124. *See Cooper v. Brown*, 844 F.3d 517, 524, 524 n.6 (5th Cir. 2016) (finding officer's actions objectively unreasonable where officer "permitt[ed] a dog to continue to bit[e] a compliant and non-threatening arrestee" for "one to two minutes").
125. *Shumpert v. City of Tupelo*, 905 F.3d 310, 323 (5th Cir. 2018).

complies with the "measured and ascending" approach, since Volmering would presumably no longer require the canine unit to restrain Plaintiff, as Plaintiff's facts suggest. In contrast, Plaintiff asserts he lodged multiple "cries for help" and "screamed out in . . . excruciating pain."[126]

An objective Border Patrol agent may reasonably believe Plaintiff would reengage the pursuit once he recovered if he were not restrained by the canine unit given his perceived prior disposition to fleeing. Volmering argues Cappy apprehended Plaintiff after he tried to "evade arrest by running away."[127] But this determination also hinges on the specific facts of the canine unit interaction, particularly whether Volmering would reasonably have been able to restrain Plaintiff on his own, whether five minutes of biting was necessary to prevent Plaintiff's flight, and other uncertain factors. Also presently unknown and un-alleged is whether Plaintiff was complying with orders or actively resisting arrest. At this stage, the undersigned cannot conclude whether a five-minute dog bite would have been reasonable given the circumstances. Accordingly, this factor is neutral.

Considering the *Graham* factors and Plaintiff's allegations accepted as true and viewed in his favor, the undersigned concludes that the live Complaint shows Volmering used excessive force by allowing Cappy to continue biting Plaintiff for five minutes even though he was unarmed and did not pose a threat. Thus, although he "had initially fled from [Volmering], he was no longer actively resisting arrest."[128]

### 2.    Clearly Established Law

Having concluded that Plaintiff has alleged Volmering used excessive force, the undersigned next considers whether it was clearly established at the time of the canine incident that Volmering's five-minute attack would violate the Fourth Amendment.

---

126. (Doc. 23 at 5).
127. (Doc. 42 at 1).
128. *Escobar v. Montee*, No. 3:15-CV-1962-D, 2016 WL 397087, at *9 (N.D. Tex. Feb. 2, 2016).

Even though the undersigned concludes the live Complaint states Volmering used excessive force, he would still be entitled to qualified immunity if the right was not clearly established at the time of the attack. "In determining what constitutes clearly established law, this court first looks to Supreme Court precedent and then [to Fifth Circuit precedent]. If there is no directly controlling authority, [the] court may rely on decisions from other circuits to the extent that they constitute 'a robust consensus of cases of persuasive authority.'"[129] "Generally, to satisfy this standard, the plaintiff must identify[] a case in which an officer was acting under similar circumstances was held to have violated the [Constitution], and . . . explain[] why the case clearly proscribed the conduct of that individual officer."[130] "While an exact case on point is not required, the confines of the officers' violation must be beyond debate.[131] "Such specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."[132]

The 'central concept" behind "clearly established" is that of "fair warning."[133] The law "can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."[134] "[I]f a reasonable officer might not have known for certain that the conduct was unlawful," the doctrine immunizes him from liability.[135]

The parties agree here that the incident in question occurred on or around April 30, 2021. By then, the Fifth Circuit had many a time considered whether law enforcement's use of a canine unit constituted excessive force in the context of qualified immunity.[136] In *Cooper v. Brown*, the Fifth

---

129. *White*, 2021 WL 6112791, at *6 (quoting *Shumpert*, 905 F.3d at 320) (alterations in original).
130. *Cope v. Cogdill*, 3 F.4th 198, 205 (5th Cir. 2021) (quotation marks omitted) (alterations in original).
131. *Id.* (quotation marks omitted); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).
132. *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11–12 (2021).
133. *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012).
134. *Id.* (citation omitted).
135. *al-Kidd*, 563 U.S. at 741.
136. *White*, 2021 WL 6112791, at *7.

Circuit encountered a canine-bite apprehension. There, plaintiff James Cooper ("Cooper") was pulled over by police on suspicion of driving under the influence ("DUI"). Cooper panicked and ran on foot into a residential neighborhood. He found shelter inside a "cubbyhole," a "small wood-fenced area used to store trash bins between two houses." Defendant Officer Brown ("Brown") arrived afterwards with his canine unit named Sunny. Brown entered the neighborhood with Sunny; the dog discovered Cooper in the cubbyhole and bit him.

Whether Sunny had initiated the attack or instead whether Brown had ordered it was disputed. Nevertheless, Sunny "continued biting Cooper for one to two minutes." Brown ordered Cooper to show his hands; during this time, Brown could see Cooper's hands and appreciate he had no weapon. Brown ordered Cooper to roll over, and Brown handcuffed him. Brown ordered Sunny to release the bite only "after he had finished handcuffing Cooper."[137]

The Fifth Circuit concluded that Brown's conduct was objectively unreasonable. The first *Graham* factor, the seriousness of the crime, favored Brown as it involved a DUI. But the Fifth Circuit found that the second and third factors strongly favored Cooper. The Fifth Circuit held that no reasonable officer could have concluded that Cooper "posed an immediate threat to Brown or others." The suspected offense was nonviolent, and Brown was not informed Cooper would be violent or had a weapon. Brown's knowledge that Cooper had no weapon further supported Cooper's innocuousness. The Fifth Circuit also found that Cooper "was not actively resisting arrest or attempting to flee or to strike Sunny." Indeed, the only act of "resistance" the Court identified was "Cooper's failure to show his hands" after Brown ordered him to do so mid-attack. The Court observed that this failure could "hardly be characterized as active resistance." In sum, Brown had subjected Cooper "to a lengthy dog attack that inflicted serious injuries, even though he had no

---

137. *Cooper*, 844 F.3d at 522–23 (quotation marks omitted).

reason to believe that Cooper posed a threat, and without first attempting to negotiate. And he continued applying force even after Cooper was actively complying with his orders."[138]

Here, Volmering argues inter alia that *Cooper* can be distinguished because Plaintiff does not adequately allege Plaintiff himself was compliant and non-threatening.[139] As noted above, it is true that the live Complaint does not allege that Plaintiff was compliant. Plaintiff's pleadings do however assert he "posed no threat" and was "unarmed."[140] The *Cooper* Court conditioned its holding in part on the suspect being compliant. While this fact does not mean a Border Patrol officer is authorized to allow his canine unit to maul an unarmed and non-threatening suspect for five minutes, this fact is sufficient to distinguish this case from *Cooper*.[141] The question then becomes one of whether, in any other instance, "any reasonable officer would have known that the Constitution required [Volmering] to intervene" in the canine attack.[142]

Plaintiff's claimed statement of law can be best described as follows: canine unit-assisted law enforcement force used against a non-threatening, weaponless target suspected of illegal border crossing for a duration of five minutes is unconstitutionally excessive.[143] Being that Plaintiff did not

---

138. *Id.* at 522–24.
139. (Doc. 42 at 17).
140. (Doc. 23 at 6).
141. Volmering also argues that *Cooper* can be distinguished because Plaintiff does not adequately allege Volmering engaged in excessive force "by directing or encouraging the attack." (Doc. 42 at 17). This argument is meritless. Plaintiff does not allege Volmering orchestrated the attack—Plaintiff claims he heard Volmering shout "Squash" to Cappy. However, he also states he is "unaware of the purpose or significance of these 'Squash' verbal commands." Even though Cappy "attacked and mauled Plaintiff" while the commands were being given, Plaintiff's allegations do not illustrate that Volmering's commands, if any, were for Cappy to attack Plaintiff. (Doc. 23 at 4–5). While Plaintiff does assert Volmering "called . . . off" Cappy, this is insufficient to demonstrate Volmering was responsible for the initial attack. Volmering's role in the canine unit incident is unclear beyond his ending the attack.

Plaintiff's allegations elsewhere state that Volmering "stood by and allowed [the canine unit] to continue mauling" him for at least five minutes. The *Cooper* Court noted expressly that "whether Brown ordered [the canine] Sunny to attack . . . is not material to [its] holding." Instead, the Fifth Circuit said, *allowing* the dog to attack "to continue for one to two minutes" was sufficient to find Brown's actions or inactions objectively unreasonable. *Cooper*, 844 F.3d at 524 n.6 (holding as such "[e]ven if the dog attacked of its own volition"). Therefore, even if Plaintiff had pleaded that Cappy initiated the alleged five-minute-long onslaught, *Cooper* makes clear that Volmering could still have acted unreasonably in permitting the canine unit to continue to bite Plaintiff for an extended period of time.
142. *Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020).
143. As the Fifth Circuit has noted, "[t]he *Cooper* [C]ourt was [] able to point to a robust consensus of opinion that an unnecessary or unnecessarily prolonged dog bite was unconstitutional." *Hinson v. Martin*, 853 F. App'x 926, 933

file a response to the Motion to Dismiss, it follows that Plaintiff does not point to any law establishing that his right was clearly established. The undersigned can thus only rely on Volmering's briefings and its own research in making the determination as to whether the right he claims is clearly established. The undersigned detects no cases suggesting that it is.

The closest analogies exist in the generic police context, wherein the use of a dog "is unconstitutionally excessive when used after the target is compliant and does not pose a risk of harm or flight."[144] Yet, even then, in those cases, the plaintiff either alleged or proved that he was complying with the orders of law enforcement. In this case, Plaintiff's live Complaint is devoid of any allegation that he complied with Volmering's orders, Volmering gave orders, he surrendered, or otherwise. Under the established case law, a suspect must have been non-threatening *and* compliant. Plaintiff's allegations lack the second element, and therefore, do not allege a right comporting with clearly established case law.[145]

Therefore, the undersigned finds that Plaintiff has not met his burden of demonstrating his claimed right was clearly established. Although it appears now that Volmering, taking all of Plaintiff's allegations as true and viewed in Plaintiff's favor, used excessive force, at this stage of the proceedings, there are no allegations indicating Volmering would have reasonably believed Plaintiff was compliant for the entire five-minute period during which the Cappy incident occurred.

In any event, even though the undersigned has concluded above that Plaintiff has alleged sufficient facts to indicate the force used in the canine unit incident was clearly excessive, Plaintiff still has not met his burden of showing that Volmering violated clearly established law. Therefore, Volmering is entitled to qualified immunity. Accordingly, the undersigned **RECOMMENDS** that

---

(5th Cir. 2021) (unpublished). Although *Hinson* was decided the day before the canine incident, the summaries of Fifth Circuit Fourth Amendment jurisprudence that the case provides is informative to the contemporaneous parameters of the right to be free from excessive and unreasonable force.
144. *White*, 2021 WL 6112791, at *12 (collecting cases).
145. *See Sligh v. City of Conroe*, No. 4:20-cv-01417, -- F. Supp. 3d -- , 2022 WL 3140502, at *4 (S.D. Tex. Aug. 5, 2022).

the Motion to Dismiss be **GRANTED** as to Plaintiff's *Bivens* claim on the basis of qualified immunity.

## IV. Recommendation

For the foregoing reasons, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED IN PART**.[146]

Specifically, the undersigned **RECOMMENDS** that Plaintiff's *Bivens* claim against Volmering (Count III) be **DISMISSED** for want of an available *Bivens* remedy.

In the event the Court is inclined to recognize a *Bivens* remedy in this case, the undersigned alternatively **RECOMMENDS** that Plaintiff's *Bivens* claim against Volmering (Count III) be **DISMISSED** on the basis of qualified immunity.

Further, the undersigned **RECOMMENDS** that, pursuant to the Notice of Substitution, the United States be **SUBSTITUTED** for Defendant Volmering as to Plaintiff's state law battery claim (Count IV). The undersigned further **RECOMMENDS** that the state law battery claim (Count IV) be **DISMISSED** as against Volmering.

SIGNED this 21st day of February, 2023.

DAVID B. FANNIN
UNITED STATES MAGISTRATE JUDGE

### Instructions for Service and Right to Appeal/Object

In the event that a party has not been served by the Clerk with this Amended Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Amended Report and Recommendation by certified

---

146. (Doc. 42).

mail, return receipt requested. Pursuant to 28 U.S.C. § 636(b), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Judge. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made; the District Judge need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the U.S. Magistrate Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the District Judge. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).